Secretary of the United States Department of Agriculture, Appellate, and Projection of Corpus Christi Council. The L is for Appellate USDA, the F is for Appellate NCC, and the P is for Appellate Humane Society of the United States. Before you begin, I don't know if you're here to hear that at the end of the argument, if you just stay where you are, we'd like to come down and greet you. With that, good morning and proceed. Good morning, Your Honors. I'm Louis Yellen from the U.S. Department of Justice. I'm here today on behalf of the U.S. Department of Agriculture. Your Honor, the government's limited appeal comes down to a simple proposition. The District Court enjoined USDA from authorizing future payments based on USDA's valuation of the trademarks. Mr. Yellen, before you dive into the merits, could we talk about appellate jurisdiction? The government's injury here really seems to flow from the June notice order, whatever it is, but you haven't appealed that. Your Honor, the government's injury flows from the court's interpretation of its injunction as prohibiting the termination payment. Right, so your theory of appellate jurisdiction has to be that you appealed the April order, and the District Court's June minute order reflects a permissible interpretation of the original injunction. It's clarifying in that sense, and so your appeal of the April order brings before us the issue that you want to bring before us. That's exactly right, Your Honor. Another way to put the point is that the government notified in what we thought was an abundance of caution, the government's intent, USDA's intent, to authorize the termination payment. The court then wanted to describe this as an enforcement of the District Court's injunction. I understand. There's no question the District Court thinks, the District Court thought that the June order simply interpreted or restated what was already in the April order, but our cases on appealability seem to require us to independently review that determination, and I don't see how you could characterize that as just a clarification for all of the reasons you give on the merits, which is you're talking about payments under the contract, under Section 1.3, to buy the asset, and she's now talking about a payment under 1.7, not based on the 2016 review, but on precisely the opposite, not the decision to continue the payments, the decision to get out of the contract. That's right, Your Honor, but the June interpretation, the June explanation, effectively became the final judgment of the District Court, and it would be the June decision that would trigger the requirement for the notice of appeal. But only if it permissively construes the April order, right? That's right, Your Honor, and the Court gives deference to a District Court's interpretation. It gives a degree of deference, but we still review the interpretation for reasonableness. I think that's right, Your Honor. Sorry, I know that's right, Your Honor, but in this case, the District Court, the June order addressed whether or not the April order encompassed a different matter, that is, encompassed a payment based on an authorization that had already been made. USDA informed the District Court that it had already authorized a payment, and the question was whether... I understand, but that's a different issue, right? That's the question whether the February order covers payments that were authorized but not yet made. No, that's right, Your Honor, but... I don't see how that bears on the separate interpretive question whether the April order covers termination payments. That's a fair point, Your Honor, but in this context, we think that it's not so unreasonable for the District Court to have interpreted its June order as encompassing the termination payment, in part because there was a dispute between the parties. The plaintiffs claimed that all along they had intended their claims to encompass the termination payment. The objection that the plaintiffs filed to the government's notice of its intent to authorize the termination payment argued that all along this had been implicit in its arguments, and the District Court accepted that explanation, that interpretation. So it's not so unreasonable for the court to have interpreted its injunction and issued this minute order that this court would have to deem that minute order so far out of bounds that it would not provide the court appellate jurisdiction. Now, we have merits arguments, to be sure. We think that the District Court made a significant error, but in light of the pleadings that were before the District Court at the time and in light of the plaintiff's argument about the way in which the termination payment was encompassed within its arguments, the District Court wasn't so far out of bounds as to create a separate decision that wouldn't be before this court. So if we assume, as you've argued, that the termination clause remains valid even after the District Court's injunction and even after the minute order, I mean, the terms of the contract talk about a voluntary termination. You keep referring to it as a termination clause, but it's a very specific voluntary termination clause. I mean, looking at the language of it. And so I'm not sure why, after the District Court's injunction of any payment, this would be classified as a voluntary termination. Oh, Your Honor, I think there's a simple answer to that question. The Board could have reasonably or unwisely decided not to terminate the contract. It would still have been obliged to make payments under the contract, but prohibited from doing so by the District Court, and that would have opened it up to contract claims. Now, the District Court, I think it's important in this context to note, did not invalidate the contract itself. It just prohibited payments under the contract. It made performance, you know, impossible, right, prohibiting payments. I mean, so I'm not sure. I mean, the voluntary clause suggests a very different type of process, right? The USDA gets written notice in advance. I mean, it's not contemplating, you know, the legal invalidity of the payment. No, I think that's fair, Your Honor. It's not contemplating legal invalidity, in part because it gives the Board complete discretion to terminate the contract at will. But I still think that it's important that the District Court did not pass on the validity of the contract and did not itself require the Board to terminate the contract. So there wasn't compulsion to terminate the contract. And even if the Board decided that the consequence of the District Court's decision is that it had to terminate the contract, that doesn't mean that it didn't undertake the obligation under the contract to make a voluntary, excuse me, to make the termination payment. I'd like to address briefly the two arguments that plaintiffs present as alternative bases for this Court's affirmance of the District Court's decision here. One is the challenge to the District Court's statute of limitations argument. And that issue turns on when plaintiffs' claim accrued. I'd like to give the Court a simple hypothetical, which I think demonstrates that the claim had to have accrued when the USDA authorized the contract and not when the Board consummated the contract. The USDA authorizes the contract. The contract requires an immediate $3 million payment upon signature, upon consummation of the contract. No one doubts that immediately after the Secretary authorized the contract that plaintiffs could go to court and seek an immediate TRO to prevent the Board from making that $3 million payment and expending what the plaintiffs would say is an illegal payment, an illegal use of producer assessment funds. Now, to put this into the Bennett v. Speer legal framework, the authorization of the contract was the consummation of agency decision and it did have legal consequences. The legal consequence was that the Board had authorization to obligate producer assessment funds by entering into the contract. And in the context of this case, there was zero reason to doubt that the Board was going to enter into this contract. And plaintiffs don't challenge that contention. They don't say that they may have reconsidered that decision. What do you do? Your position seems strong if you just look at the July contract and then the September, I think, USDA. But we also know in the record that it seems that the contract was subject to some further negotiations, changes, whatever it is, which seems to suggest that there must have been some later authorization by USDA. On the contrary, Your Honor. The administrative record contains one authorization and one authorization only, the September 13th authorization. Sure. But is it USDA's position that the Board can enter into a contract, get approval, then make changes to the contract and not seek a new approval on the theory that the changes are minor? No, Your Honor. USDA's position is any change to the contract requires USDA authorization. Requires a subsequent approval. Authorization, exactly. And to be clear. And we have a record document. It appears to be a later contract and authenticity is not in dispute, which says that the otherwise seemingly final July contract was subject to further negotiations as late as September. And to be very clear, that other contract had nothing to do with the purchase agreement. It only said that the parties... It said that the purchase agreement was being... They were contemplating, they were negotiating future further agreements. There is no evidence that the parties decided to request USDA authorization for any further changes to the contract. And so it's possible that they were negotiating future changes. If they were negotiating them and if they had decided to pursue those changes, it would have been the Board's obligation to go to USDA to get further authorization. It is a permissible inference that they, in light of the absence of any further authorization in the record, it is a permissible inference that, in fact, for whatever reason, they decided not to pursue whatever terms they were contemplating. And remind me, the one other piece of record evidence that bears on this is some minutes from a Board meeting where they make reference to these ongoing negotiations? I believe that's right. I don't have the record citation for you. And you have the same answer, which is... Exactly. There's zero evidence that the parties agreed and that the Board sought authorization from the District Court. Excuse me, from USDA. I have one more point about the lobbying argument. Thank you, Your Honor. USDA, there is zero evidence in the record, and plaintiffs point to no evidence, that USDA, in authorizing either the agreement or any of the subsequent purchase payments, did so for lobbying purposes. Now, they do claim, and we don't concede the accuracy of their characterization, they do claim that there is evidence that the Board was working with the Council to allow the Council to engage in lobbying. But the challenge here, in the complaint, pages 71 to 75, is to the USDA's authorization of the contract and of the purchase payments. And again, there is a statutory and regulatory prohibition on the use of funds for lobbying purposes. And in the absence of any evidence that USDA, in making those authorization decisions, was intending to permit the funds to be used for lobbying purposes, one must assume, this Court must assume, that the agency was acting consistent with the law.  Thank you. Can I just start you where I started, Government Council, which is on appealability? Yes, Your Honor. So your client is in a somewhat stronger position than the Government, to the extent you took up both the April order and the June order. That's correct, Your Honor. And so you have a theory, if we think of the June order as a new injunction, you have a good theory of appealability. Similarly, if we think of it as a permissible interpretation of the April order, you have a good theory of appealability. But what if we think of it as just kind of a nullity? Like, it has no more or less legal effect than if the judge had given a speech and said, gee, it's a really good thing that I stopped the termination payment. Wouldn't the upshot of that be, you've appealed the April order, but the April order doesn't address the termination payment? And then our arguments would still stand, that the summary judgment order does not prohibit the termination payment. What it prohibits are authorizations, approvals, and payments on the basis of the 2016 review, which the termination payment is not. So our argument wins, regardless of whether or not it's... What's our basis for appellate jurisdiction? The basis for appellate jurisdiction of the original summary judgment order? If we think that the June order has no legal effect, it's not an injunction. It's not an injunction, and it's not a reasonable clarification of the April order. I may not be understanding you, that the April order was a final appealable order. Sorry, I'm not understanding what you're saying. I think we have a question. Maybe what Judge Cass is saying, why is the limitation on paying the termination payment properly appealed to this court? Right. To the extent that plaintiffs are taking the position that the original summary judgment order did enjoin the termination payment, then that is the basis. In other words, we say that the April order means what it says. It doesn't mean what the district court thought. And you appeal the April order, and you can make your broad argument that none of these decisions were reviewable because they were committed to agency discretion by law, which is an argument that attacks the conclusion regarding the continuation payments, but none of that lets you get into the termination payment, the issue about the termination payment. I think that the issue of standing actually precludes... I understand. Right. It's different. Let's assume we think there's standing. Again, I fear that I'm not understanding what your question is getting at. If the original summary judgment order didn't enjoin the payment, then the board could have made the payment, which they weren't able to do because it was enjoined by the minute order. And we interpreted the minute order as modifying the injunction because it changed the legal relationship of the parties, and because the original order... Originally, the termination payment wasn't challenged. The contract's overall validity wasn't challenged. And so we did not interpret the district court's original summary judgment order as encompassing that. But since the district court made that separate minute order, which did modify it, we feel like it is independently appealable. So as I started to say, we feel like the court need not engage in resolving merit issues, and indeed cannot because no plaintiff has Article III standing, which requires the court of jurisdiction to decide any merits question. In 2015, when a panel of this court reversed the district court's holding that no plaintiff has standing, it explained how Mr. Zillenberg's economic injury theory of standing could move forward if he had facts to support it. So the board's allegedly unlawful overpayments for an advertising campaign does not use divert funds from other promotions. Because of that, pork demand is lower, and thus the price at which pork producers can sell their hogs is lower than it would be if the board were spending those funds on legitimate promotions and other demand-enhancing campaigns. So it set out four components of this roadmap to standing. One, that the board doesn't use the trademarks. Two, that leads to a lower demand for pork. Three, that in turn leads to a lower price at which pork producers can sell their hogs. And four, that there's other promotions that would therefore increase the price of pork. When it was remanded to the district court and moved on to the summary judgment stage, Mr. Zillenberg was required to provide facts in support of his standing theory. And the only evidence produced- Maybe yes, maybe no. I mean, it depends on how broadly our prior opinion sweeps. And there's language in our prior opinion suggesting that general economic reasoning gets you from, I think, your step two to your step four. And if that's sort of more like a legal principle of outstanding than a pleading principle about, you know, what you need on a motion to dismiss, our ruling might be binding. Well, at the motion to dismiss stage, which the previous- that was the stage at which the previous panel ruled, not only did the panel have to assume the truth of the allegations, but they also had to draw all assumptions in favor of the plaintiff. And also at that stage, the plaintiff had alleged- Mr. Zillenberg had alleged an actual reduced return on his pork checkoff investment, which he has now abandoned at the summary judgment stage. The declaration in support of his standing submitted at summary judgment is completely silent on that point. So what the key allegation in the complaint that the panel had to assume was true has now been withdrawn. He's no longer claiming this reduced return on investment. It's a little ambiguous on that point. He doesn't have the line about return on investment, but he makes reference to direct economic benefit of lawful promotions. And in the context of this case, given the history and what the district court said, what we said on the prior appeal, why wouldn't we charitably construe that to mean he suffered a pocketbook injury? Number one, just the flat statement that he's been deprived of the economic benefit of lawful promotions is basically saying that he believes that a statutory violation occurred. The statute requires lawful promotions. This promotion wasn't lawful, so therefore I was deprived of what I'm entitled to under the statute. But a panel of this court in 2016 in Hancock v. Urban Outfitters interpreting the Supreme Court's decision in Spokio, which held that there must be a concrete and actual injury even in the context of a statutory violation. The same circumstances there as here in the Hancock v. Urban Outfitter case. Two plaintiffs went to retail establishments. When they made their purchases, they were asked for their zip codes. They claimed in violation of two D.C. consumer protection statutes. So there, like here, it's undisputed that they were statutory beneficiaries of the statutes that they claimed were violated. They were consumers. The statutes were meant to protect consumers. And they claimed that their rights were violated because the statute was supposed to provide them this benefit of protecting them from being asked for their zip codes.  And the court found that they lacked Article III standing because they couldn't allege any concrete injury that flowed from the result of that violation. And the same thing here in this case. Mr. Dillenberg doesn't claim that he can't sell as many pigs or the price for which he can sell his pigs has gone down or that his operations have been affected in any way, that he's had to lay off employees, that he's had to reduce operations, that he can't meet his targets. Nothing. We have no idea what the actual concrete economic injury is. And by asking and by arguing that it's the law of the case that Mr. Dillenberg has standing on the basis of the Panel's 2015 decision, the plaintiffs are making the exact error that led to the Supreme Court's decision in Wuhan versus Defenders of Wildlife reversing a finding of standing. There, like in this case, the district court had originally granted the government's motion to dismiss for lack of standing. Then the Eighth Circuit reversed, and on remand, when it moved forward to the summary judgment stage, the district court denied the motion on the ground that the Eighth Circuit had already determined standing. The Eighth Circuit affirmed, and then the Supreme Court reversed, holding that the plaintiffs hadn't met their burden of establishing standing at the summary judgment stage. Wuhan was pre-Twombly-Iqbal, right? Yes. So the rule at the time was that you didn't need to make virtually any allegations on a 12B stage. You could say something wholly general, and we would assume all of the subsidiary details. But now the pleading rule is that you need to set forth specific facts, and the courts only make reasonable inferences. And that's the context in which the prior appeal was before us, and we said, good enough. And that doesn't sound hugely different from a summary judgment posture, where we draw all reasonable inferences in favor of the non-moving party. The summary judgment standard from Wuhan still stands, and it still requires specific facts. There are no specific facts in Mr. Dillenberg's declaration. And again, he's withdrawn this allegation about the reduced return on investment. He's not even claiming any of those elements in the previous panel's roadmap. I don't know how he can say that he has an economic injury when he can't claim – if he had one, he should be able to say it. Thank you. We'll hear from Mr. Tinsman. Thank you. May it please the Court. I haven't asked for rebuttal, and I'm not sure that we need one for the conditional cross-appeal, but if that arises, then there's a minute to respond. So I'll start with the termination provision and Judge Rao's question about the tax, because the way I read it, I don't get past the first line before it says, they may elect to terminate obligations to pay the unpaid balance. The district court terminated all unpaid balance. She terminated all further payments. There's nothing for them to elect to terminate. And that's the specific language of the clause. She didn't terminate the contract. She said that approvals of continuing payments based on the 2016 review were arbitrary and capricious. It's very different. And she enjoined all further payments. Based on the 2016 review. Right. So going forward. It would be open to the agency to make a new record. Well, let me point, there are two issues that arise from that. And the first is the textual issue that I raised, to go back to this, which is that if she terminated any further obligations to make payments, that's the only thing that the text of this termination clause refers to. It doesn't refer to termination of the agreement. It doesn't refer to a termination payment. It says you can issue a notice to terminate any obligation to pay the unpaid balance. So she eliminated any obligation to pay the unpaid balance. Now, if they want to, we've just been notified, they're going to try to make a new contract, and if they can justify that, that's a different issue than if they still have an obligation to pay the unpaid balance. The second issue has to do with this idea that there is still an agreement out there that has been, where they made this obligation 20 years ago on a federal contract, and it just sneakily bypassed all the annual approvals and extensions, and now it's an obligation on the government 20 years later. But we talked about it as it came up in the brief. One of the key elements that protects the public funds and the nature of public contracts is that each year, both through the Empty Deficiency Act and the AMS guidelines requirement that all contracts have extensions tied to the budget year. In order to protect... Right, which seems to be why the contract, each yearly payment has to be separately authorized, and the contract incorporates this odd termination mechanism precisely so that they can get out if they end up having a problem with authorizations and anti-deficiency act and such. So, yeah, and I think that's correct, and so legally I think the way the courts have dealt with how that technically works and I think how the judge was reviewing it in cases we cited I think lighter in our briefs, but there are others, that each year the decision is to either terminate or extend and re-adopt the terms of the contract. Right. And what in effect the judge did in 2016 when she said, your decision to extend the contract was arbitrary and capricious and it's set aside, that means that the extension and re-adoption is invalid. That was set aside. That means that contract was not extended. That means they have to terminate. No, it means the contract ended because it was not extended because that's what the Amputee Deficiency Act and the guidelines operate to not allow a government to be obligated beyond a fiscal year until an appropriation is, funds are available and appropriation is made and then the contract is re-adopted. If it's not extended and re-adopted, then it ends. Now, they're going to try to make a new one. But you cast your claims, we're talking about this deemed count four, which is a little bit mysterious, but by analogy to the claims that you did make, what you said was it was unlawful to, and that's out of the case on timely discretion. And then you said each subsequent authorization was unlawfully approved. And what should have happened was that the authorization shouldn't have been made and the government should have terminated it. You didn't say that the government would be violating the law by doing just that, which is not authorizing the new payment and then terminating the contract. I'm sorry. Let me, I think I followed, but if I'm confused then. The way you cast this was not that the termination clause is unlawful or can't be invoked if the government has to get out of the contract for legal reasons. The way you cast this is the authorization was improper and therefore they should have invoked termination. Particularly in counts two and three, when Forth, The Other Light, and Equal was replaced, the argument is it was arbitrary and capricious to extend and revoke the contract terms. And by analogy under the deemed count four, it was arbitrary and capricious to authorize the, what was it, the 2008 term payment, and therefore just extrapolating from how you framed the other counts, and therefore they should have invoked the termination procedure in 2018. Right, and so I agree with that framework that they should have, so then the legal challenge is that it was arbitrary and capricious to extend and re-adopt, and that is set aside. And if the ability to extend a federal contract into another fiscal year is set aside, according to Leiter, the contract ends. And that's the way that the public contracts are guaranteed because otherwise what you end up having is a termination clause such as this or a claim that it floats on continuously. The termination clause says, well, if this contract is set to be arbitrary and capricious at any point, then we'll agree to pay $20 million for the remaining balance. So they can't get around that, but I think the answer is yes. The upshot of the argument you just made is that hypothetical termination clause was unlawful when enacted. And you don't have that argument here because you did challenge the contract as enacted, and the court held that to be time barred. Well, what we challenged was the approval of the entry into the contract, but I don't think we ever challenged that it had a termination agreement or that the termination agreement was lawful to include in contracts. In fact, I think that they're required. Which just strengthens the point that your case has not been about whether the termination process itself is independently illegal. So I think there are two issues. One is whether they now have the right to invoke this termination clause, and the other is whether or not it was arbitrary and capricious to extend the contract when they had the ability to get out. So I'm examining what happened in 2011 and 2012 when the Secretary had to decide whether or not to readopt and extend the contract, and having the option of a lawful termination. That it was not arbitrary and capricious and that extension should be set aside, which ends the contract at that point. They can renegotiate on non-arbitrary terms if they think that they can get into it, but as a legal matter, that ends the contract. So I don't think that at any point we challenged the termination agreement. I don't think there's a live termination agreement now to end, because in 2016, what the court set aside, the court set aside the 2016 decision to extend and readopt the contract term, to extend and readopt the termination agreement. Essentially, legally, what happens is the contract terminates because she set aside the extension. There is no termination agreement to invoke. And I think it's a separate issue to say whether... We're in APA review. Yes. So you need a specific agency action before the court. Right. And the only thing the court can do is set aside specific agency action found to be unlawful. And we're not supposed to do anything else. So this comes up, the specific agency action is authorization of a payment that is consideration under Section 1.3 of the contract. And the district court in APA review says that is unlawful. Right. Period, full stop. That doesn't tell you anything about the separate payment contemplated under Section 1.7 of the contract, under different circumstances. Well, so at the very end there, I think a new question came up about whether or not the APA is a separate payment or whether it's just another payment in consideration of the year of use. I get that. You have your best argument, in my view, is this isn't really something different. This is just one more year. Yes. And I think that... We talk about that in the brief and what it is and also the intro language. But here you were making a different argument. Yes. I think this one is connected to what the... To speak just for a moment about what was deemed to be count for. Right. What was represented, including, and we point to it in our brief, including in the summary judgment briefs of the government, there is no issue prior to the 2016, no injury plaintiffs can suffer that wasn't consumed by the 2016 agreement. And that, going forward, everything related to this contract, the only injury, the only squandering of money that they could suffer, would relate to this court's decision under the 2016. Under the 2016 review. So, I think my point about the extension and re-adoption, just to, I think, return to that for a minute, because the way I see the legal effect, I don't have any problem with the contract having a termination agreement. If the termination agreement did have something that said, hey, if this court finds the contract arbitrary and capricious, we will pay the unpaid balance. Then I would have an issue with the lawfulness of the termination agreement. So, I don't think that there was any problem with having a termination agreement in effect. I think the guidelines and federal spending laws really require that. But the way I think the legal effect of the judge's ruling is, each year when the secretary approves and re-adopts a contract and extends that, it re-adopts all the terms. But if the court says that the extension was set aside, the extension was unlawful and set aside, the contract ends. It does not get extended or re-adopted. So, the contract terminates at the end of each fiscal year. And that's required by the Entity Efficiency Act, so we don't over-obligate public terms. Didn't the district court explicitly contemplate that there might be future payments under this contract that could be justified on a better record for the government? Well, my understanding of what she wrote was, or her findings, and what she was saying was that there would be, she was commenting, I believe, on what she called the admittedly thin administrative record prior to 2016. But she did point out, particularly in footnote 23 and other areas of the rate, the real problems that weren't dealt with in this deal. So, but what she essentially said was that all injuries would be resolved by my ruling on this. Now, if they think that they can modify it and try to go back and make a new case for the district court, and then later adopt, you know, back-ratify a contract, I don't think they're going to try that. But I think that they can't get into the, we're going to extend the contract beyond the fiscal year  Do you think, though, that that is permissible under the district court's injunction, right? They enjoin from approving any future payments based on the 2016 review, right? And so, like, if there was another review, right, with different facts, as Judge Kass had suggested, could they then resume making payments under the contract? From my perspective, no, that would be unlawful because that contract has expired. It expired at the end of the fiscal year. But the district court doesn't say that they are terminating the contract. No, she didn't say that, but she did raise the answer at the hearing, and our discussion with her throughout was that if she prohibits extending the contract further, that would end. She doesn't need to say, I specifically terminate the agreement, because of the nature of the way federal spending laws work and appropriations and obligations. What she's saying is, if I don't allow them to extend it beyond 2016, then it terminates. And, you know, I don't think that they necessarily would be barred from trying to enter a new contract, although I think they're going to have problems based on the facts of this one. But under the settlement agreement, I think that they certainly can. But the guarantee that producers had, and the concern that producers had, and what has been painfully frightening to producers throughout these checkoff programs, were the issues that the Supreme Court dealt with in 2001 and 2005. And that is, they're being compelled to pay into this system, and the only way that this program remains constitutional is if it's controlled entirely by the government and the funds aren't squandered or transferred to a private entity to support their speech. So we walk a very fine constitutional line. So I think what the concern about, so when the settlement came about, because producers had voted to end the port checkoff in a referendum, and the secretary said, it will go on, but we will promise you, we will promise you that all dealings between the board and NTPC will be at arm's length and business-like. So if they want to do more contracts, they at least have to make that record. They have to make that record that can be justified, because that's the only protection that producers have. And what we talked about in the first case was that they at least have the right to effective, reasonable promotional uses of their funds. So I touched... Is the constitutional problem you're referring to a non-delegation problem? What is the constitutional problem? Well, it arises with the... It's tied into the issue of whether or not this money is being given to a private entity to make determinations on its own about what messaging and how to use it and whether it's in lobbying. In 2001, in the United Foods case, the court said... The government speech argument wasn't presented until it got to the Supreme Court, and the court said... Yeah, you're talking about the compelled speech case. Yeah, the compelled subjectization. I'm sorry, I lost the train, but how is that relevant to the issues before us? Because what we talked about was the underlying... Why it was so important for the contracts between not just the board and MPPC, but all of the check-off boards and private trade associations to ensure that we're not paying $60 million for a trademark that's worth $30 million when it's really in order to get money over to a private entity. You're talking about what you see as misuse of funds. You're not talking about whether that speech is government or private. I think where that ties, where that connects, is if the misuse of funds essentially amounts to the government advocating or delegating or giving control over the messaging to a private entity, that's when you get back into the constitutional issues that were a concern in the United Foods. My point to tie it back to Judge Rao, which I might have gotten off track, but the reason that when you asked about whether they could renegotiate, they can enter contracts with... I mean, if they think they can justify this with a proper valuation and get a new contract, they can do that, but it has to be one that's done at arm's length so that producers can be assured. Right now, the only thing producers have is this trademark that was overpriced and not valued. Mr. Penger, you would have no way of knowing it because your clock is out, at least it is on this side, but your time is up. Could I just ask about standing? So usually when we move from a motion to dismiss to a motion for summary judgment, the plaintiff makes a fuller showing. Here, it seems like you made a lesser showing. You have a very threadbare affidavit, which largely just parrots the allegations in the complaint, except that it seems to pull back on the key allegation about a pocketbook injury from return on investment. I think... Let me talk about the distinction, and particularly with this Fokio argument, is these are unique programs. These are different than, say, a procedural violation or a consumer protection statute or a general protection statute that's designed to protect against harm where if a zip code has gotten wrong or the wrong receipt is given, you're not necessarily harmed in that, and that, the court says, is not a concrete harm. What the first panel said in this case was the failure to provide lawful and effective promotions results in a failure to provide an economic benefit, and it's an economic benefit that he's compelled to pay for. He's not getting the effective promotional services that the law requires and whatever downstream effects that come from that. You can't say that the maladministration of a federal program is the injury that gives him standing, and that's not the injury we recognized. No, it's... It has to be that the maladministration of the federal program causes him the classic Article III injury, which is when he sells the pigs, he's not getting as much money as he otherwise would or he can't sell as many pigs or whatever it is. Well, I mean, the way I understood the first panel and the way I read this argument is that at least we're not talking... If he was talking about damages and wanting to collect the specific losses... No, I'm talking about... That's a different issue, but for Article III, what he's showing is, look, I'm entitled to these promotional services that are designed to enhance the market base. In fact, I'm paying for them. I'm not getting them. If I'm paying into the social security system and not getting my check, or if I'm paying for it privately, if someone purchases radio ads and doesn't get the ads run, if it was damages, I'd have to prove how much I've lost. But for Article III, not getting the product I've paid for and being deprived of whatever downstream returns they would have produced for me is enough to show at least a threat of injury. But your client isn't entitled to any specific kind of advertising in the way that the social security beneficiary is entitled to the check. Well, I think I disagree to the... You're just saying the program is being run badly. That's either a generalized grievance about how the executive is doing business, or if you say, well, no, we're different because we're the intended beneficiaries of the program, that's a statutory beneficiary argument, which seems no good after Spokio. So the distinction I see is if I had said that the assessments were being collected in the wrong way, and he's entitled to have them collected by check instead of credit card, or instead of online, that would be a simple programmatic violation that I think would not... would not, just because he's a statutory beneficiary, he and other producers are entitled to receive the promotional services, if there's just a procedural violation, just that the program is being run badly, I think that that type of an injury would be problematic. But what he's alleging is I and the other producers who are being compelled to pay for this program are not getting the lawful and effective promotional services. And so we have to obviously get into the merits to prove that they're not being given, but what he says is I'm entitled to receive promotional services because that's why I'm paying. That is not the injury that we recognized in the previous appeal. The injury that we recognized is downstream from that, which is the impact on the pig farmers' bottom line. Sure, and I think when he gets to that point, I think that then he gets to Clinton v. New York and other cases that said, okay, look, we can apply... we don't... the laws of... we credit the laws of basic economics. That's not what changes between the pleading stage and the summary judgment stage. The laws of... the basic laws of economics to show harm, like in the competitive injury cases and others, those... what changes is the facts to which we apply them. So we have to show that he was someone who was entitled to these promotional benefits who didn't get them, and if he doesn't get the effective promotions that were... that are designed to enhance the marketplace, then we can show that by just basic economics, you don't get the ads, you don't get the opportunity for returns. Right, but the character of government action in those cases is different. It's the government exercising sovereign power to restructure markets. And, right, if they designate a forest twice the size of New Jersey as off-limits for timber harvesting, will allow basic economics to support a conclusion that that's going to harm timber farmers. That seems different from what we have here, where all the government is doing... What you say they should have been doing is just adding their voice to the marketplace of speech. And if we take your allegations... if we take your merits allegations as true, which I think we have to for standing purposes, what you say they're actually doing is paying to lobby, which for all we know is a more effective way of propping up pork prices. Well, again, let me respond directly to the question and then talk about the implication. Again, if we're measuring that they may be engaging in promotional lobbying that's more effective, the only thing that producers have in this case is that we're guaranteed to get a value... that we're guaranteed to get a trademark for $60 million. What was or might be done after, you know, outside by a private entity is, you know, it may or may not ultimately, you know, be something that they think is helpful, but what producers are entitled to is this... you can't convert the funds over to a private entity to decide what lobbying to do and say, well, this benefits them because, one, you run into a First Amendment issue. What all the producers know is, hey, we're being promised this trademark, but if they want to contract with MPPC for lawful activity, that's fine, but they can't just say in the guise of a trademark we're going to give money over to this organization and then they may end up lobbying, they may end up doing something good with it, because that's no longer a government-controlled speech operation and then it compels such an issue. But to talk about the... what you were talking about, just adding the government's voice to public speech, I mean, I want to emphasize that... and I think we've talked about it at the first panel, what this buys them, what this buys producers is at least the effort to receive an effective marketing program by pooling their advertisements together. So I think it's more than just we're being deprived of the government having a speech. We're being deprived of the government actively marketing our product on our behalf, and if they give it to a private group for them to decide what to do with our money,  Your basic economic logic here is if the government were spending a lot more money advertising for pork, that would tend to push the prices up. Pork prices up. That's your theory of bottom line injury. Well, I think my theory of bottom line injury is that... what the first panel said is that if the money isn't squandered or given to a private entity, it would be available and they would be required to use it reasonably to further engage in lawful and legitimate promotion activities. So my injury is more similar to the radio ad scenario where what producers are paying for and being promised is a very specific marketing and promotion service. Right, and what they're getting instead on their merits allegations is a bunch of lobbying. So what is the basic economic logic that just lets us assume that the money spent for advertising would have been better for his bottom line than the money allegedly unlawfully spent for lobbying? Because I don't see that any of our cases support that proposition. I'm sorry, could you repeat that again? I think I missed it. Your allegation is that they're spending all this money by design for lobbying. And what you want them to have done instead is spend all the same money for advertising. And the question for standing purposes is whether we can just assume as a matter of economic logic that the one is worse than the other for pig farmers' bottom line. Well, let me clarify because I think our first premise is you're overpaying for a trademark that can't be justified for the money that's spent. So essentially the primary argument before you get to the lobbying argument, the primary argument is you're diminishing our advertising power. That as a group, you promise to at least be effective. Does that argument even apply, though, to the limited issue that's presented here, which is whether they can lawfully make the termination payment, which is different from the other ongoing payments? Is it different where the government, I mean, if we accept USDA's argument, if they're contractually required to make the payment, does that make a difference from the ongoing payments for the use of the trademark? In terms of the harm? In terms of the harm, I lost the last part of the question. Does this issue go to the termination payment? You're saying that your bottom line harm is that the funds are being misused for lobbying or other purposes, right? But if the funds are really just being used to satisfy contractual obligations that the government is bound to pay, then isn't that a different type of claim from what you're dealing with? I don't think you can separate the two because the question, especially with the checkoffs and government action, is it can't just be that whatever we've contracted for is therefore that we have to then abide by it because the government is still bound by furthering the purposes of the statute and the arbitrary and capricious standard. And so what they have to do is say that this contract is a reasonable effort to further the purposes of the statute. So the contract ties into the statutory purpose and the standing issue relates to the producers' vote. It's imperative in this initial referendum to accept this, to accept the compelled payments in exchange for a very strict framework of how the government would run the advertising. So there's definitely a broad discussion within that framework, but outside of that framework they can't be compelled to either support speech and inside of that framework, I think we're talking more about a business judgment type of rule. There's broad discretion, but if the secretary is squandering the money rather than giving them the advertisements that are designed to expand the marketplace for their product, that ends up being the entry and to that we can credit laws of economics. And I think that just before I sit down, that ties into the law to apply issue that was raised because I think in addition to the federal spending laws, you have throughout the guidelines and the Port Act, you have checks on making sure the money won't be squandered or that it won't be given to a favored vendor. There's a clause we cited in our brief about that the guidelines expect that the board explain why a particular contract was chosen and if not, as lowest bid. Well, all of these are designed to protect the investment of the producers into the fund that's designed to protect them. Thank you very much. Thank you. Let me see if we can fix your clock first. There we go. Your Honors, I'd like to make two brief points. On Judge Katz's questions and concerns about jurisdiction, I point the court to pages 663 to 68 of the appendix. That's the plaintiff's response to USDA's notice of its intent to authorize the termination of the payment. We agree with the arguments made there on the merits, but I think they demonstrate that the district court's interpretation in the minute order of its prior injunction is not so baseless. It's not so frivolous that this court couldn't construe the minute order as at least a reasonable, if erroneous, interpretation of the injunction. I'd like to stress, however, and this is perhaps a more important point, that if the court determines that the minute order is not a reasonable interpretation of the injunction, and the court determines that it must dismiss the government's appeal for lack of jurisdiction, it would be, I think, proper for the court to explain that the reason it was doing that is that the minute order, because it was an unreasonable interpretation, has no legal effect. That is, the minute order which prohibits the USDA from authorizing the termination has no legal effect because the prior injunction only prohibited future payments based on the 2016 agreement. Which would sort of get you a decision on the merits baked into the jurisdictional disposal. But it would explain the court's jurisdictional ruling. And I think it would be fair. We wouldn't be sneaking in, illicitly, a merits argument. The one other point I'd like to briefly make. Plaintiffs have a theory that each year the contract is renewed again. And so, because the district court prohibited future payments, the contract vanishes, and there is no termination obligation. That's just not a reasonable interpretation of the contract, or what the district court did, or what the district court thought it did. The USDA authorized the board to undertake a contract. That contract has obligations that apply each year. USDA, to be sure, has to authorize payment. But if it didn't authorize payment, that would permit the board to invoke the termination provision. There's just no basis for saying that there's a renegotiation or renewal of the contract each year. Thank you, your honors. Thank you. Thank you. I'd also like to quickly make two points. First, as to the appealability of the amended order, obviously we felt like it was a modification of the injunction, and therefore it was independently appealable. But even if it's deemed a nullity, we would agree with the government that this court should explain that, because there is an actual case or controversy at this point about what the meaning of the amended order is. And it has placed USDA in the position of having breached the contract. So an actual case or controversy has flown up, sorry, has come from that. So it can't be the case that this amended order could escape judicial review in its entirety. The second point I would like to make is as to standing, counsel for plaintiffs is making this argument that producers are entitled to effective pork promotion, but there's no evidence that either the prior, the other white meat promotion, or what it was replaced with, the pork be inspired promotion, were ineffective. There's the district court's merits ruling, which is that you vastly overpaid, or you are now vastly overpaying for those trademarks. I don't think she ruled that the pork board was overpaying for the trademarks. The pork board has a current campaign which continues to use the pork in design logo. So the only way to have the current campaign would be to continue to have use of the mark. But the whole premise of the merits ruling was they bargained through the stipulation. They bargained for a new assessment, whether it made economic sense to continue with these payments. And the government made that assessment and tried to value the trademarks. And district court thought that the government's assessment was arbitrary. The district court disagreed with the way the government's expert went about evaluating the- So I don't think you can challenge the proposition that there was some kind of maladministration here. I think the question about the methodology used by the expert is a separate question from whether the pork producers are receiving pork promotions. It is not as if when the pork board stopped using the pork, the other white meat as their primary campaign, that they continued to take a check off money and did nothing with it. They have this other campaign. So there was no separate evaluation of what the four individual marks were worth. Thank you. Thank you very much. The case is submitted.
judges: Griffith, Katsas, Rao